Welcome to the Eleventh Circuit. We're pleased to have everybody here. Just as a quick matter before we get started, I just want to say that Judge Grant and I truly appreciate having Judge Damien sitting with us. We're going to have her sitting with us today and Thursday and we appreciate her willingness to serve in this capacity. We have three cases today. Let's go ahead and get started with the first one. But first, for those of you who are not familiar with the Eleventh Circuit, the way this works, you're going to see we work in a traffic light system. When it is green, keep going. When it is yellow, you have two minutes left. And when it is red, that does not mean start the final topic you have to talk about. It means finish the sentence you're talking about, unless we otherwise indicate you should go on. Our first case is Bear Warriors United, Inc. v. Secretary, Florida Department of Environmental Protection, 25-11612 and 25-11821. Mr. Harris, I know that you have some time for rebuttal, but you may proceed. May it please the Court. Florida takes manatee protection and conservation extremely seriously, which is why it has created an elaborate regime of state laws, state agencies, and state policies designed to protect and conserve manatee populations. Here, however, plaintiffs in the District Court invoke the Endangered Species Act to short-circuit all of that and put Florida's environmental and conservation programs under federal court control. I'd like to focus on two aspects of this case that are relevant to both causation and the merits, or standing and the merits, that both independently resolve it in our favor. First, the causal chain from D.E.P.'s permitting actions or inaction to the plaintiff's injuries has at least nine separate steps. That is longer than the causal chain in any other Circuit Court of Appeals case finding an ESA violation. In fact, the only case that we've seen that's even similar to a causal chain like this is Aransas Project, where, of course, the Fifth Circuit vacated a finding of ESA liability and held the causal chain was simply too long as a matter of law. The second important feature of this case that we think pretty cleanly resolves it in our favor is both the plaintiff and the District Court have now conceded that the individual landowners, the people who operate and have the septic tanks that are allegedly leaching into the lagoon, they say that they concede correctly, we think, that they are not violating the ESA. So, they're thus trying to get D.E.P. at one step removed from that based on an authorization theory. The problem is, even the plaintiff's own cases, cases like Loggerhead Turtle, cases like Strahan, those are the cases about when the government can be held liable at that one step of remove. Every single one of those cases says in no uncertain terms the government has to authorize something that's illegal or something that is itself a take. And so, if it's just we authorize people to do something that does not violate the ESA or break the law, you certainly can't go one step back and hold the state liable. Some of this relates to the fact that harm has been pretty broadly defined in the regulation to include habitat modification. I understand there is a proposed rule out there if during the pendency of this appeal, the rule as is is finalized, there might be cause for us to remand to the District Court. But right now, we don't have a final rule. So, we're working with what we have. We have a broad definition of harm. How do you avoid Sweet Home, which upheld the definition of harm, including being somewhat broader than the statute? How do we get past that? Right. So, with respect to, so obviously under Steelco, Article III standing has to come first. So, if the court doesn't think they're standing, that has to be the first decision. And proximate cause is completely unrelated to harm. So, even if you accept, and that's why we ordered the arguments in the order we put them, because even if the court accepts, and we agree as we sit here today, that is in the regulation and Sweet Home is out there, but there still has to be proximate cause from the defendant to the plaintiff that includes a take and includes harm. So, even fully accepting that definition of harm, we think this causal chain is just too long. And I think, I can't put this any better than the way the Fifth Circuit put it in a Rancis project. So, at pages 558 to 560 of a Rancis project, just like our case, you had an extremely long causal chain where the state licensed water withdrawals, that made the water saltier, that hurt the crabs, and then because there were fewer crabs, the cranes had less food and they got emaciated and some died. The Fifth Circuit looked at those findings and said, even accepting all of those factual findings, this is just too long as a matter of law. And I think, again, I think their cases ultimately actually help us because, for example, Strahan is often held up, the First Circuit, it's often held up as the outer limit of ESA liability. So, there, the government was sued and found to violate the ESA because they authorized fishing equipment and nets that were catching whales. And so, that's one or two steps removed, and even that is held up as sort of, again, the outer limit of how far you can go in a causal chain. So, I think, I mean, again, the court has to address standing first and then we think if the court agrees with us on causation, it ultimately doesn't matter what happens with the definition because we argue that and completely believe we're, you know, entitled to reversal. But a Rancis, of course, was not a standing decision, right? So, I'm not sure how we take that to standing, even if you're right about proximate cause not being sufficient. But my question is, do you think that the ESA can be used to deal with sort of an aggregate problem ever, right? So, let's say that, let's say that the, I think you agree that if one company were spewing, say, the same amount of, or a concededly harmful amount of whatever substance, that the federal government or a citizen suit could go after that particular violator, right? But what if it's, if it's two, I wonder if that's the same or if it's a hundred or if it's a thousand, how do you break down the coverage of the ESA for these aggregate polluters? Or, you know? So, Judge Grant, the argument you just articulated, it's not exactly how the plaintiffs put it, but some of the amici put it in those terms. Whatever the validity of that theory, that would be expanding the ESA beyond anything any court has ever done. And what I would say is, the way to deal with that is the way Florida is dealing with it. We have, in coordination with the federal government, to implement the Clean Water Act, we have total maximum daily load of pollutants. We have a Basin Management Action Plan. So, for example, Florida, by 2025, all new construction in this area needed to either connect to a sewer or use special septic tanks that are better at removing nutrients. By 2030, we go a step farther and say, even existing properties need to either connect to a sewer or use nutrient reducing septic tanks. And so, the answer to your question about the diffuse injury, the answer to that is to deal with it using other tools, but not by an ESA suit saying that you're taking manatees because there's 16,000 septic tanks in the region at issue here. And so, it's not to say that you add up all of those and combine them into a take and then make some remedies that a court imposes on the state. I mean, the state is actively working on these issues pursuant to both state and federal law. And that, we would say, is how you deal with these. So, what should they have done? What would be the, you're saying, don't go after DEP to fix this problem. Let's just assume there is a problem and that there is a taking happening. What would be the remedy then? That instead of going after DEP, what should they have done? Well, I might say, Your Honor, I don't want to dispute the premise, but we just don't think there's a take here. This is a broader problem. It affects an entire region. The state has acknowledged this for decades that, again, there are multiple state laws specifically about cleaning up the lagoon. The state does not dispute that this is a problem that needs to be addressed, and the state is addressing it, and it has gotten better, as some of the testimonies show in the trial. But I think we would dispute that you can take all of these amorphous factors and combine them into a take. And just like the Rancis Project, here are two intervening causes that happen that affect manatees in the environment. Hurricanes and cold winters. So, hurricanes do two things. First, the hurricanes directly disrupt some of the seagrasses. There were hurricanes, I believe, in 2017 and 2020. They also, because of flooding, can cause overflows from sewage systems or wastewater treatment plants. That's obviously completely beyond our control, but those happen from time to time. But there is something within your control. I mean, there is some evidence, and you're not denying that there is some evidence that the, at least historically, the runoff from these septic systems was causing, or at least was contributing to the problem. So, how, if it's not enough, what is already happening, and more needs to happen, what should they have done? Who should they have sued? Well, as I said, I think the remedies are what are already happening. And here's another point about the incidental take permit. So, one of the remedies here was to apply for an incidental take permit, which we've done on schedule, as required. The incidental take permit requires you to show how you're mitigating the harm. Do you know what we submitted to show how we're mitigating the harm? What we're doing. We submitted the Basin Management Action Plan. We submitted the state laws about septic plants. And so, it just, this is a very artificial- But that doesn't mean that it's been blessed by any, you've submitted the same information. Nobody said that's okay. It hasn't been blessed. Correct. It's still pending. But again, I would just, I think our view is, again, the state has not disputed, and again, is actively working on this. So, for example, the law about the septic tanks requiring the enhanced tanks and requiring people to connect to sewage, including by 2030 for existing tanks, that was passed in 2024. And so, again, this is something the state has recognized they're working on, but we just don't think you can take all of these diffuse harms and add them up into an ESA violation. Because I think whatever the merits of what's being argued, it is going far beyond anything any court has recognized before. And again, even their cases. So, Strahan, Loggerhead Turtle, and there's one called Glickman, Animal Defense Fund v. Glickman. Every single one of those says if you want to get the government at the one layer of remove based on authorization or permitting, you have to be showing that it's something illegal or something that is itself a take. And we just don't have that here. So, in Loggerhead Turtles, the court said, you know, it described the fact that the district court had power to hold otherwise the turtles posit would violate the accepted notion that both a person whose actions adversely affect a protected species and a governmental body that authorizes that person's actions can violate the ESA's take prohibition. There's no citation for that accepted notion. Do you agree that that's an accepted notion? I agree at a high level that if a take has happened, of course, there can be a remedy. And as even Strahan, their case made clear, the typical remedy would be an incidental take permit, not these additional remedies. So, I don't dispute there can be a remedy for a take. No, but the point there was, so obviously a person who, you know, kills a turtle could be held liable. But this says that also a governmental body that authorizes that person's actions can violate the ESA's take prohibition. So, let's say that Florida had a turtle hunting program and they gave this person a permit to kill the endangered turtle. Do you think that in that case, Florida could be liable under the ESA or do you think not? So you just described the facts of Strahan. I mean, in Strahan, the fishermen needed permission to use certain nets and gear. The government gave them permission and then the nets caught whales and took them. And so, I do agree. Now again, this court has, and this court has accepted in Loggerhead the notion of an authorization theory. But I think on causation, two things still have to happen. Someone still has to commit a take. And I think the causal chain, like in Strahan, like in Loggerhead, has to be way shorter than this highly diffuse and contingent chain you have here. It sounds like then, are you backing away from your anti-commandeering theory or how do those two fit together? No, not at all. I mean, and I think the remedy for an ESA violation is to get an incidental take permit. But we're absolutely not backing away because the state administers a septic tank permitting program, which the court has now essentially taken over and said we're not allowed to do that. And Murphy makes clear there's no distinction between positive and negative commandeering. So it doesn't matter if you're saying you can't do this or you must do this. And the last thing I'll say about this, there's some talk of preemption. Preemption is completely inapplicable here because there's no, it's not like there are federal septic standards or a federal septic permitting regime and you can then go to the feds to oversee this. If our septic rules are permitted, are enjoined, there's just no law there. So this is not at all a preemption situation. And we just completely disagree with the notion that this is regulating the state and private parties even-handedly because private parties don't issue septic tank permits. Right. So let me ask you a question, something that has been on my mind throughout all of this and in reading all of the papers. The district court in sort of evaluating what was happening with the septic runoff and how that's affecting the manatees, as you have indicated, we know that when the hurricane comes through, it causes the disruption that leads to the loss of manatees. We know when Florida has a cold winter, as it has had recently, that can lead to the loss of manatees. We know that this injunction does not cover existing septic tanks. Maybe if the existing septic tank needs to be re-permitted, but so there's a whole swath of septic tanks that are not covered by this. And while there is certainly an indication in the papers that plaintiff was worried about wastewater treatment plants, which also have some runoff, that's not the subject of the injunction. So my question is we are now left with the injunction covering the permitting of new septic tanks. Does cutting off the ability to permit any new septic tanks lead to a quicker recovery of the manatee population? Is there anything in the record that says, okay, this injunction now means the manatees come back two years earlier than we thought? That question, I think, perfectly reflects why there's also no redressability here. So the district court said, and their expert agreed, even if all new discharges stop, it will take 10 years for the seagrass to recover. And that also assumes no intervening causes such as cold winters, hurricanes, and other things. And so 10 years, how on earth can we say that this is a redressable injury when even under their best case scenario with no intervening events, maybe in 10 years we have replaced the grass, which will then improve the manatee's diet, which will improve their recreational and aesthetic interests. But if it hadn't been cut off, would it be 20 years? I mean, does it help? Is 10 years shorter than it would be without cutting everything off? I think there was testimony that without anything, it would be 12 to 17, and it would be 10. But it's pure speculation. And when you look again at Aransas project, the court said, not only was there too long of a causal chain, but each and every step, again, this isn't straight hand where the nets catch the whales. This is an incredibly long causal chain. And just like the Fifth Circuit unanimously said in Aransas project, each and every one of those steps requires modeling, estimation, inference. This is not a one-to-one where you turn on the lights and they attract the turtles, or you put out the nets and they catch the whales. This would be the single longest causal chain that has ever been approved by a federal court. And we would submit that this court should say exactly what the court said in Aransas project, which is just, this is too long as a matter of law, and it's just too contingent and speculative. I do have one more question on commandeering. Are you familiar with any cases that find a commandeering problem that involve a regulatory action that's not specifically demanded by a statute as against a state? Do you see what I'm saying? In Prince, it said state officials must do this in the statute. Whereas here, it's ultimately federal law potentially controlling what the state does, but it's a little more attenuated. There is one. I think it's this court in Bourbon, which was also a plaintiff wanted, and I'll confirm that that's the correct case, but the plaintiff wanted, demanded some sort of a gun license, I believe, and said the state had a constitutional obligation to issue it. And so that would have been a judicial remedy. And this court said, one reason we can't do this is because we would essentially be commandeering. So I think that would be the court using commandeering to say why it can't issue a certain remedy. Thank you. Thank you, Mr. Harris. Ms. Filo, I hope I'm pronouncing that correctly. Filo. Good morning, your honors. May it please the court. Elisa Filo for the plaintiff, Bear Warriors. As the district court found, DEP violated the Endangered Species Act by authorizing the pollution of North Indian River Lagoon that has caused and will continue to cause harm to the manatees that rely on it. I hope to make three points today. First, that plaintiffs have standing to challenge that violation. DEP's actions here injured their economic and aesthetic interests in seeing the manatees in their natural habitat, and the district court had the power to redress that. Second, that this is not a case of vicarious liability. DEP is being held responsible for their own actions that proximately caused and will continue to cause harm to the manatees in the North Indian River Lagoon. And third, that the district court had power to remedy the violation that it had found. As New York v. United States makes clear, it's a very basic principle that federal courts can order state officials to comply with federal law. Turning to standing first, I would just note that Aransas does have a standing conclusion. It holds there that the plaintiffs in that case did have standing based on injury and fact traceability and redressability. I think similarly here, plaintiffs have an economic and aesthetic interest in seeing these manatees in the wild. That interest is injured by DEP's actions, where they see less manatees. The manatees they do see are starving or dying. This is not a case of... Speaking only for myself, I think you can have standing for a case that you ultimately don't win. So for me, I think that your bigger arguments are related to the merits. And I wonder, on proximate cause, let's say that there was a FDEP meeting. I know this is not how the regulations happen, but let's say that it was. And everyone seemed primed to cut off septic tank regulations. And then one person stood up and made a very passionate argument for why we need more septic tanks in this area for development and freedom and et cetera, et cetera. And everyone was moved. It was like a Jimmy Stewart movie. And all of a sudden they said, yes, I'm changing my vote, more septic tanks. Do you think that person could be sued under the ESA? Without their actions, these septic tanks would not have existed, I think you could show in my hypo. So that person being just a member of the public making an impassioned plea? Right, but who very clearly changed everyone's mind. All of those voting on it said, you know, before I was going to be against it because I love the manatees. But now I think that these toilets are more important. I think that they wouldn't have had exclusive authority to control the pollution like FDEP does here or to fix the problem here. So I think that that's a more attenuated chain than we have here. This person who's convincing the regulator to do so. Here, it's the regulator who has the power and has had, I think it's the first line of my opposing counsel's statement of the case, is that they have authority over the water pollution in the North Indian River Lagoon. And that exclusive authority, I think, is the first step in that proximate cause chain. And I know my opposing counsel describes it as nine steps. I think we get there in three. I think that DEP had the exclusive authority over pollution in the North Indian River Lagoon. Second, that that pollution caused the seagrass to die and the macroalgae to bloom. And third, that that ecological shift has caused and will cause manatees harm. And I don't actually... Doesn't that ignore the people and businesses requesting permits and then using them? They're using them pursuant to the permits and the authority given to them by DEP. So DEP is only one who has the control over that. And DEP is the only one who can remedy that. The individuals flushing their toilets, that's not the foreseeable harm in that individual instance. It's the aggregate of the regulatory regime as a whole. And I think DEP was very aware it was harming the manatees. We have that poster from St. John's Water Management District. And the title is, where have all the seagrasses gone? Why are the manatees hungry? And the answer was, there's too many nutrients in the water. And who controls the nutrients? It's DEP. Do you agree with your friend on the other side that bear warriors or the federal government could not sue the individual emitters either individually or in the aggregate as some sort of class action against people whose aggregate septic tank usage performs a take on the manatees? I don't disagree that it's not a problem at that individual level. The problem is in the aggregate. The problem is what DEP authorized. No, I know that's what the problem is. But the question is, do you agree that those individuals could not be sued over this either individually for their portion of the take or in the aggregate for their combined take? I don't think so. I think that the entity committing the take here is DEP. Whether it's for foreseeability or the substantial harm component that this court made clear in Miami Seaquarium, the individuals are acting as part of this regulatory regime. It is the aggregate. It is the whole regulatory regime that FDEP put in place that is causing the take. And that take is a violation of the Endangered Species Act. So I assume if there were one business or facility, I'm trying to think of something bigger, say a hospital, right? The gigantic hospital that was alone in the lagoon and it alone emitted enough to cause the problems that you're suggesting, right? I assume obviously that entity could be a target, right? Yes. Yes. What if there were two and each was 50-50 and neither one alone would cause the take? So I think that's the kind of proximate cause analysis that this court is well equipped to handle in a variety of circumstances. You know, they're fact specific. And I think it's very clear that for causation, you don't have to be the only cause. You don't have to be the last cause. So I think a court would have to evaluate how much is it a significant harm the way that this court did in Miami Sea Aquarium. Was it foreseeable to them? But here it was foreseeable. I don't take my opposing counsel to disagree that they knew this was a problem. They knew that the water was polluted and they knew it was harming the manatees. This is a particularly easy case of foreseeability. And the proximate cause only takes a couple of steps to get to DEP's actions authorizing the pollution that was causing this ecological shift that caused the manatees harm. So how do you distinguish this case from Aransas, which has a longer causal chain? I understand y'all are disputing how many steps, and I'm sure opposing counsel would say you've collapsed some of those steps. Why is this not more similar to Aransas, where that was more attenuated, where they found that it wasn't foreseeable, the causal link, the causal chain? How is this case not Aransas rather than loggerhead turtle? Sure. I think Aransas actually demonstrates why proximate cause is the limiting principle in these cases that courts can turn to and say, was this foreseeable? And in that case, they determined it was a fortuity rather than foreseeable. And that was because for six decades prior to this one year with an extraordinary drought, the cranes had actually been thriving. The population was increasing. Here we have the opposite. DEP has known for a long time that this has been a problem. You have the Indian River Lagoon Act in 1990, I think, identified sewage pollution as a problem. You have their first BMAP, I think, was in 2013. Their current, their last one was in 2021. This is, in each one, they know this problem. They know the pollution. They know that it is harming the manatees. Why are the manatees hungry? The answer is the nutrients. And it wasn't because of any extraordinary circumstances. There's no facts that my opposing counsel can point to about hurricanes or some particular use that is an intervening cause. Here, the factual findings, which are subject to clear error, was that this was an entirely foreseeable and predictable result of DEP's regulatory regime. Does it need to be, if you look at what you're saying about individual emitters, why wouldn't the question for, the comparable question for the DEP be, does a particular permit cause a take? I think that's what we saw in Loggerhead, right? One light source can confuse one set of turtles and cause them to go the wrong way, whereas one sewer permit cannot kill a manatee, right? Even if you assume that it's more direct than it is versus the kind of differently than we look at individual permits. I think that the Loggerhead, it's both that one light could confuse a turtle to wander off, but also the entire regulatory regime, that this is something that they authorized and that acting pursuant to that authorization, the light, the beach owners were using lights that was causing a harm. And that's not different than here. The DEP is issuing permits that in their aggregate are causing this pollution that harms the manatees. That's the same sort of take. It's the same as putting the traps in the water, the traps that capture the links, that here, the take is the regulatory regime that is causing that pollution in the aggregate. And that is redressable by the district court. I want to really briefly turn to that last category. Can I ask you one quick question? So your amended complaint talks about both septic systems that individual owners have, but also wastewater treatment plants. How did we end up with an injunction that is limited solely to the septic tanks? I think there's two questions. One is whether it's for redressability and one is kind of the equitable authority to impose that remedy at the end. So I think redressability, any kind of incremental benefit to that water that reduces the pollution is going to make it redressable. I think your Honor's opinion in South River Watershed made it clear that if you just reduce the pollution, that the likelihood of reducing the pollution is going to make it a redressable. But why not continue to go after treatment plants, which would presumably, when they have an overflow, be a much bigger deal? So I think they could have. The fact that they didn't go after more, I don't think, undercuts the fact that the injunction of the septic tanks is itself a redressable, makes it a redressable injury. I'm just wondering because you continue to talk about wastewater treatment plants in your briefing before this court, and yet the injunction is covering septic systems. I think that that was one part of the violation, and it was one that the district court decided could be cut off temporarily while they seek an ITP, and that ITP presumably would cover the entire regulatory regime, including those wastewater treatment plants. And let me go back to, you talked about foreseeability, and I guess what I am getting hung up on is there are a lot of external natural events that cause the manatee death. In fact, the big manatee death event, I think, was related to a hurricane disturbing the environment of the waterway. And so, yes, septic systems and runoff are certainly contributing nitrogen to the water, and nitrogen leads to algae bloom, and algae bloom chokes out the seagrass, which is what the manatees should be eating. So again, that's where my causal chain starts to lengthen. But how is the manatee death foreseeable by the septic discharges when we have these other naturally occurring events that really are causing, are wreaking havoc on the system, the hurricanes and the cold winters? I think the district court put it well that the water would be able to handle some of those kind of natural forces if it wasn't already called hyper-eutrophic, if it wasn't already burdened by those pollutants, by those nutrients that were authorized by DEP. And there's just no evidence in the record to support that counter narrative. I think the DEP is well aware that its authorization inputs the nutrients into the water, and that those nutrients are detrimental to the system. And that other events may make it worse occasionally doesn't undercut that as a cause. And the two unusual mortality events, I think, were tied to that ecological shift. The first one, I think, was the manatees ate too much of the macroalgae and developed this bacteria, the Clostridium bacteria, and died as a result of that. And the second one was pure starvation. The manatees were dying because they didn't have enough of the seagrass to eat. And that seagrass death, the experts explained at trial, is because of the shift in the water, the water quality, the pollution. I'd like to drill down on commandeering for a bit if we could. You emphasized in your brief, the district court's statement that the anti-commandeering doctrine does not apply when Congress even handedly regulates an activity in which both states and private actors engage. Do private actors engage in sewage permitting? No, but they engage in takes. And I think that's the level of abstraction that that question is asked at. So, I mean, where I'm trying to think of how, that's an interesting response, because I'm trying to think of how that kind of line of argument would go in another context, right? Because is this really regulating the take? I mean, the FDEP is not manatee hunting, right? What they're physically doing is issuing a permit. And it seems to me that that's very different than what these people are doing, which is, you know, using their sewers. Why is the permit not what's being regulated here? So, I think that it's important to distinguish, I think, and I think it's been collapsed a little bit in the briefing, whether the problem is the statute or the problem is the district court's remedy. The statute even handedly applies to any person. And as Joaquin B. Holland said, I think they called it a heavy lift when it's generally applicable like that. So, whether it is an individual who violates the take provision or a state entity that violates the take provision, they are equally liable. And that is not an anti-commandeering problem. It is not commandeering the states to regulate their individuals. It is telling them to comply with the federal law. But wouldn't that be if the state had, let's say, a jail, right, on a body of water and that jail was itself alone, releasing enough nitrogen that it was definitively causing harm to the manatees, right? I think certainly there, that would apply. Because it wouldn't be that you're regulating the jail or the confinement, it would be that you're regulating the emissions, which is what a lot of human activity does. But here, you're trying to go a step beforehand and regulate the state's quintessential government action of issuing permits to people to do other things. I mean, I think certainly in the Clean Water Act context, when states are giving permits, I think it's conceded that that's regulating a government action. Why isn't this the same in what's really being regulated by at least the court action, if not the statute? I think the question is what the statute is regulating. It is regulating any person who engages in a take. And I understand Your Honor's question that the take here is a regulatory activity. But like in the Clean Water Act, I think it's an example in United States v. New York, or New York v. United States, that states in those kind of cooperative federalism can choose to regulate pursuant to the federal standards, or their actions can be preempted. It's not just the fact that regulation is at issue doesn't transform this case. And Holland v. Brackeen is actually a good example of a case where the analysis of the statute asked if it was even-handedly applied, even though you're in this kind of quintessentially state activity of family law. And I just want to return really quickly to that distinction between what the statute applies to and what the district court did. And I think you'll see in New York and in Prince, I think in New York it's 179, that no one questions a federal court's ability to order state officials to comply with federal law. That's just not an anti-commandeering problem. And whether or not those federalism concerns, of course, animate whether or not a district court exceeded their equitable discretion, we can talk about that. But it doesn't call into question the validity of the statute. The problem could be with the remedy, but it doesn't flag a fatal flaw in the statute, which applies even-handedly. But doesn't it depend on what is being targeted? I mean, here again, not to belabor the point, but here it's targeting the state's regulatory authority, whereas in a very different statutory scheme, the Clean Water Act, as you say, the federal government says, you can do it, but if you choose not to, we will do it, right? But here, there's no federal kind of ability to take over sewer permitting if the state doesn't do a good enough job of preserving endangered species. And isn't that exactly the kind of concern that we've seen, you know, for centuries, about the federal government having the ability to kind of sideways regulate within states, rather than taking ownership and political accountability, ownership of and political accountability for that particular regulatory scheme? I think those concerns are about Congress or the executive. I think that's the language that Prince uses, commandeering state officials to comply with a federal regulatory scheme. And you look at the statute to determine if Congress did that. And here, it's just not there. It applies even-handedly to anyone who commits a take. And I don't think that analysis changes, that heavy lift isn't met just because of the facts of this case. This isn't regulating the individuals in the state. This is making sure that the state complies with the Endangered Species Act when it violated it. Let me ask you a question. Do you now, seeing what's been happening with the DEP trying to comply with the injunction, would you agree that the injunction might have been a little heavy-handed, a little broad, maybe requiring a little more than the department was capable of doing? I think that there are problems with the specifics of the injunction than the correct approach is just to remedy for the district court to tinker with that. But it doesn't call into question the standing of the plaintiffs, and it doesn't call into question the constitutionality of the statute or the violation that the district court found if the district court exceeded its equitable authority in the specifics of this injunction. But it gave you pretty much everything you were asking for, except the sewage treatment plants. It pretty much gave you everything you were asking for, and it doesn't seem clear that it's having the effect. It's redressing the problem, even though you got everything you wanted. Well, we don't know yet. So the ITP is still pending, and that will be the state. We leave it up to the state to figure out how best to conserve the manatees, how best to approach this problem. In the documents that they submit, they have to submit a conservation plan, a habitat conservation plan, which will minimize and mitigate the take to the maximum extent possible. I don't know that we know the effects yet, the quantifiable effects of ceasing those new permits in that moratorium. So I think, as I discussed at the beginning, those certainly redress the injury, just are likely to reduce the pollution. And they're within the district court's equitable authority to stop at least part of the violation that it had found, and to order it, as other courts have done, to go seek that ITP, that incidental take permit, to reduce that take going forward. Would you agree, going back to the question I asked at the beginning, we have a proposed rule dealing with the revision to the definition of harm, if that rule, say in the next week or so, comes out and they finalize the rule? Should we send this back to the district court? Yes, we think that remand is the appropriate course. We'll argue that Sweet Home has statutory stare decisis, that it's the best reading of the statute based on the text, the ITP provision, and this long-standing contemporaneous regulation. But we agree that the district court can review that in the first instance, can review the effect of that regulation if and when it comes out. So remand would be appropriate in that instance. One quick question returning to redressability. Is it your understanding that environmental cases often, it can take a while for a court's order to have the effect that the party is seeking and that you believe it will have? Yes, it can take a while. That doesn't undermine redressability, that it's a problem that's severe and will take time. But the question I think, as Judge Damien pointed out earlier, is it a decade or is it 17 years? That's still redressable, that difference. Do you have any cases that you think explain that well? I think the South River watershed case is a helpful one in terms of reducing the likelihood of injury based on pollution. I think a Rancis project found standing and redressability in that case. And I think the Supreme Court's alternative diamond or diamond alternative, that's a different context, but in the economic injury says even $1 difference is going to be a redressable, is going to redress the plaintiffs, their economic injury. And I think here, you know, that $1 analog is even a little bit better of water pollution is going to help, even if it doesn't completely fix the problem or even if it doesn't do so immediately. Great. Thank you. Thank you. Thank you. Mr. Harris, you still have three minutes. Thank you. Just a couple quick points. To start with Judge Damien's question about maybe the injunction was a little overbroad, the feeding monitoring programs. So core to this injunction is that the state needs to stand up programs to feed and monitor the manatees. Monitoring meaning you tag them and follow them. The problem is, not only does DEP not have authority to do that, that itself would violate the ESA because you're not supposed to be feeding and tagging. We saw the quarterly report. And so not only do we lack authority, and of course we complied because we're under a court order, but not only do we not have state law authority, but we couldn't even do that without federal permission. We've applied for it, but haven't received it. One quick note, you know, we've talked a lot about a Rancis, but just a quick note on proximate causation from Sweet Home. So there was this big fight between the dissent and the majority where Justice Scalia said, no, this habitat thing is way too far. It's going to be way too broad. And the majority and Justice O'Connor responded and said, no, proximate cause is what you use to fix this. And so Justice Scalia had this parade of horribles where he said, this will result in things like the farmer tills a field, the erosion flows downstream, it blocks oxygen and it hurts fish. And Justice O'Connor said, no, of course not. Like, that's all proximate cause. Our case is even less proximate cause than the scenario that Justice O'Connor said is not enough because ours would be as if the state had to authorize the farmer to till the field and you're suing the state instead of the farmer. And then the last thing, just to note... Is this sort of like Rapanos in that we're looking to... I mean, Rapanos, of course, didn't have a majority and this did, but how much weight... I find Justice O'Connor's appealing and it makes sense, but how much weight can we put on it since it's one, not five? Yeah, it's a concurrence and there is a footnote in the majority which absolutely endorses the theory of proximate cause to say this has to be a meaningful restraint to prevent what Justice Scalia says that it'll turn into strict liability. And then Judge Branch, your question about what to if the rule comes out. So it's been reported the rule is at OIRA now, which could mean it's coming sooner. It could also mean it still has a while. But our view is standing and proximate causation are completely separate from any change because if the court agrees with us on either of those issues, then there's no need for any remand because we argued and briefed the case under current law. And so only if the court disagrees on those would we need to go back. When did it get to OIRA? I'm sorry? When did it get to OIRA? I think it was early April. It was on the... And again, we don't know what...  Yes. And we don't know what it says, of course, but it's indicated that it's being reviewed. And then we would say, and we can put in a motion if needed, if there is going to be some sort of a remand, I think we would certainly renew a motion to stay or vacate the injunction because, as the home builder's brief said, this is actively preventing development in a key area of the state, even though state law today requires all new systems to be the nutrient-reducing systems or to connect to a sewer. And then, again, I'll just conclude where I started, which is to say this is something Florida takes seriously. We're making progress, but the way to make that progress is not through an extraordinary injunction based on a merits theory that no court has previously... Let me ask you a question about what you just said. Is this injunction halting development, or has it simply caused homeowners or home builders to make extra effort to connect to city sewer? I think if the sewer is not available, there's nothing to connect to. And there are, in this area, is there a lack of availability of a city sewer? There are certainly still places. And, again, I think the plaintiffs have stipulated that it wouldn't violate the injunction, for example, to replace a broken septic tank with a new septic tank. But with respect to new greenfield development or new areas, yeah, the home builder's brief talks about that, and that's right in the heartland of the injunction that those permits can't be issued. So they... I mean, I had that same question. Have they completely stopped... Have they had to completely stop development, or is there a way around it? Well, unless it's able to connect to an existing sewer. And is there availability of connections to existing... In some but not all areas. I mean, again, the home builders are closer to it on the ground and have explained it in their brief, but that's our understanding of how it works. Here's an interesting question that goes to the commandeering. I wonder if someone bought their before this injunction and then couldn't make appropriate use of it, would there be a regulatory taking? And if so, would the appropriate target of that taking suit be the state because it is the one that put in place this regulatory stop, or would it be the federal government since the federal government is the one that demanded it from the state? We, in our brief... The judiciary cannot afford to pay for takings, so I'll take that off the table. In our brief, we said the best way to handle that, and it absolutely does raise taking concerns, is simply to make sure the statute doesn't reach these outlier outcomes, which would raise takings concerns, but it absolutely would. Thank you. Thank you. Thank you. We have your case under advisement. Thank you all. Thank you. Thank you. Our second...